UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES,<br><br>  Plaintiff,<br><br>v.<br><br>BEVERLY LOCKHART,<br><br>  Defendant.<br>_____ | Criminal No. 12-09-ART-(4) |
| UNITED STATES,<br><br>  Plaintiff,<br><br>v.<br><br>BEVERLY LOCKHART,<br>MARROWBONE HOMETOWN<br>PHARMACY, INC.,<br><br>  Defendants. | Criminal Nos. 12-08-ART-(2), (4)<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The story of Pandora's Box teaches us that seemingly innocuous actions can have serious, permanent consequences. When Beverly Lockhart spoke to law enforcement officers, she might not have realized that those statements would lead to criminal charges against her. Unlike Pandora, Lockhart has a chance put her statements to the officers back in the box. She has filed a motion to suppress, arguing that her statements were taken in violation of her Fifth Amendment rights. Lockhart's motion lacks merit because her testimony at the suppression hearing was not credible. So her statements remain out in the open and may be used against her at trial.

## BACKGROUND

Beverley Lockhart is charged with conspiring to distribute controlled substances; conspiring to sell, purchase, or trade prescription drug samples; conspiring to commit health care fraud; and conspiring to commit money laundering. *See* Superseding Indictment, R. 16; Second Superseding Indictment, Criminal No. 7:12-08, R. 82.[1] How does one person end up implicated in so many different criminal schemes? The story starts with a pharmacy.

The indictments allege a series of intricate conspiracies, but the basic moving parts are as follows. Lockhart worked as a manager and a pharmacy technician at the Marrowbone Hometown Pharmacy, which her brother James Ronald Huffman owned and operated. R. 16 at 1–2; R. 152 at 162. The pharmacy had connections to two doctors. The first was Dr. Roos, who worked in Houston, Texas. Patients would travel from Kentucky to Houston to receive prescriptions for pain medication from Dr. Roos and then return to Kentucky to fill those prescriptions at Marrowbone. *See* R. 16 at 1–2. Many of the pills were later sold. *See* R. 16 at 2–3. The second was Dr. Thad Ray Manning, whose office was in the same building as Marrowbone. *See* Criminal No. 7:12-08, R. 82 at 1–2. Dr. Manning allegedly gave Marrowbone some of the drug samples that he received from pharmaceutical representatives. Marrowbone used those samples to fill prescriptions, thereby increasing its profits. *See id.* at 1–2, 4. Lockhart, as a pharmacy employee, allegedly participated in both of these schemes.

---

[1]There are two criminal cases pending against Lockhart. Lockhart's motion to suppress was filed in Criminal No. 7:12-09. *See* R. 108. The motion and all related filings were incorporated into Criminal No. 7:12-08. *See* Criminal No. 7:12-08, R. 89. The motions, hearing transcripts, and report and recommendation in the two cases are identical, except that the report and recommendation in Criminal No. 7:12-08 also addresses a motion to suppress filed by Marrowbone. Except where otherwise noted, this Memorandum Opinion and Order cites to the filings, transcripts, and recommendation in Criminal No. 7:12-09 rather than providing parallel citations to Criminal No. 7:12-08.

As part of the investigation into those schemes, the government planned and executed a search of the pharmacy to collect evidence. Special Agent Mark Bartley of the Food and Drug Administration, the lead investigator on the case, recruited fourteen other state and federal law enforcement officers to help execute the search warrant. *See* R. 159 at 4. Some of the agents were assigned to search for evidence, and others were assigned to try and interview pharmacy employees. *See id.* at 5. The day before the search, Special Agent Bartley briefed the officers and told them that the search was a low-key affair and that no arrests were planned. *See id.* at 4–5. The search began around 9:30 a.m. the next day and lasted until about 5:00 p.m. *See id.* at 4, 9.

During the search, Special Agent Bryan Ballman of the Food and Drug Administration and Detective Amos Adkins of the Kentucky State Police interviewed Lockhart. *See id.* at 5–6. After entering the pharmacy and locating Lockhart, the two said they would like to ask her some questions and asked if there was a place they could do so. The three proceeded to the pharmacy's employee break room. *See id.* at 6. Special Agent Ballman then gave Lockhart a noncustodial warning, meaning he told her that she did not have to answer questions, that she could leave if she wanted to, and that she would not be arrested. *See id.* Lockhart did not receive a *Miranda* warning. *See id.* at 8. After a few general questions, the agents questioned Lockhart about the alleged conspiracies described above. *See id.* at 6–7; R. 152 at 76. The interview lasted around two and a half to three hours. *See* R. 159 at 6. After the interview, Lockhart approached Special Agent Ballman and provided him with more information. *See id.* at 7.

Lockhart moved to suppress all of the statements she made to law enforcement officers on the grounds that her statements were taken in violation of *Miranda v. Arizona*,

384 U.S. 436 (1966). *See* R. 108. The motion was referred to the Magistrate Judge for a report and recommendation. *See* R. 84-1 at 9; 28 U.S.C. § 636(b)(1)(B)–(C). The Magistrate Judge held evidentiary hearings, solicited supplemental briefing, and then recommended that this Court deny the motion. *See* R. 122; R. 152; R. 150; R. 159.

Lockhart's testimony differed from the testimony of the law enforcement officers on several points. To resolve the factual disputes, the Magistrate Judge began by finding that Lockhart was less credible than the law enforcement officers. *See* R. 159 at 2–4.

After addressing the credibility issue, the Magistrate Judge turned to Lockhart's *Miranda* claim. A *Miranda* warning informs a person of the right to remain silent, the right to a retained or appointed attorney, and the risk that any statements made could be used against her. *See Miranda*, 384 U.S. at 444. A *Miranda* warning is required before law enforcement officers interrogate an individual in their custody. If the warning is not given, that individual's statements cannot be used in the case in chief against her at trial. *See id.* The United States conceded that Special Agent Ballman and Detective Adkins did interrogate Lockhart but did not give her a *Miranda* warning. So the issue was whether Lockhart was in custody. *See* R. 159 at 10–11.

The Magistrate Judge found that Lockhart was not in custody, that *Miranda* did not apply, and that any statements she made to law enforcement officers were admissible against her. *See id.* at 21. He recommended that this Court deny Lockhart's motion to suppress, *see id.*, and Lockhart objected to that recommendation, *see* R. 179.

## DISCUSSION

Lockhart's objection unfolds in two steps. She argues that the Magistrate Judge erred when he discounted her credibility and found that Special Agent Ballman did give her a

4

noncustodial warning. Then she argues that the erroneous finding was the lynchpin of the Magistrate Judge's custody analysis. Without it, she believes that the Magistrate Judge would have concluded that she was in custody and that suppression was warranted because she did not receive a *Miranda* warning. Because this Court agrees with the Magistrate Judge's credibility determination, her objection is overruled.

I.      **The Credibility Determination**

A district court reviews the objected-to portions of a report and recommendation de novo. *See United States v. Raddatz*, 447 U.S. 667, 681–82 (1980). When an objection challenges the Magistrate Judge's credibility determination, the district court has discretion to decide whether to rehear the evidence presented at the suppression hearing. *See id.* at 680–81. A rehearing is unnecessary in this case. Neither side requested a hearing. And the dispute is not about *what* the various players said at the hearing but *which* of them to believe.

At the suppression hearing Lockhart testified that she was never given a noncustodial warning, and Special Agent Ballman and Detective Adkins testified that she was. *See* R. 152 at 69–70, 98–99 (testimony of Special Agent Ballman); *id.* at 109–10 (testimony of Detective Adkins); *id.* at 165 (testimony of Lockhart).

Faced with this he-said, she-said testimony, the Magistrate Judge determined that Special Agent Ballman and Detective Adkins were more credible than Lockhart. He did so for three reasons: (1) Special Agent Ballman and Detective Adkins testified consistently despite being separated during their testimony; (2) Lockhart's testimony suggested that she was exaggerating the fear she felt during the interview; and (3) Lockhart gave inconsistent statements during the interview. Lockhart disagrees with all three of these reasons. She also

5

offers three additional reasons to doubt the Magistrate Judge's credibility determination: (1) the Magistrate Judge discounted some of Lockhart's other statements for no good reason; (2) Special Agent Ballman's notes from the interview do not state that he gave Lockhart a noncustodial warning; and (3) the Magistrate Judge ignored the testimony of another pharmacy employee. Each of these arguments will be addressed in turn.

<u>Consistent Testimony of Special Agent Ballman and Detective Adkins</u>: The Magistrate Judge found Special Agent Ballman and Detective Adkins credible because they testified consistently. They both testified that Special Agent Ballman gave Lockhart a noncustodial warning. *See* R. 152 at 69–70, 98–99, 109–10. The two did not hear each other's testimony because they were separated. *See* Fed. R. Evid. 615 (allowing a judge to separate witnesses). The Magistrate Judge reasoned that it was unlikely that the two agreed to lie on the stand because they worked for different agencies and were not in frequent contact. *See* R. 159 at 2–3. Collusion was also unlikely because of the detailed planning required and the doubled risk of exposure on cross-examination. *See id*. While on the subject of cross-examination, the Magistrate Judge pointed out that defense counsel's questioning yielded no evidence of collusion. *See id.* at 3.

Lockhart claims that the government intentionally structured her interview to allow the two officers to lie on the stand and still appear credible at any future suppression hearing. *See* R. 179 at 5 (arguing that the search was "designed" to have two agents present at the interview and "designed" to produce only one written record).[2] Nothing in the record supports that version of events. There are plenty of reasons why law enforcement might

---

[2] Lockhart also includes a one-sentence argument that she was "not permitted" to ask another employee to serve as a witness to her interview. *See* R. 179 at 5. She does not include a record citation for this statement because there is no evidence in the record that she ever asked to have another employee present.

prefer to have two officers present unrelated to manipulating the credibility determination at a potential suppression hearing. Examples include officer safety, increasing the chance that an officer can establish a rapport with the witness, allowing one officer to serve as a check if the other questions a witness too aggressively, and building in redundancy to make sure that all of the relevant questions are asked. Lockhart does not explain why this Court should believe that the government's motivation was to facilitate perjury rather than one of these other, more plausible, explanations.

Lockhart also argues that the Magistrate Judge's reasoning would support the government in every case where two officers interview one suspect. *See* R. 179 at 5. She is wrong. The Magistrate Judge focused on the fact that Special Agent Ballman and Detective Adkins testified *consistently* even though they did not hear each other's testimony and were cross-examined. *See* R. 159 at 2–3. So the Magistrate Judge's reasoning does not require a finding that two officers will always be more credible than one suspect. The reasoning supports only the uncontroversial conclusion that there is no reason to doubt two officers' credibility when, as here, there is no evidence that they lied.

Lockhart's Testimony: The Magistrate Judge discounted Lockhart's testimony because her statements were "self-serving and indicative of exaggeration." R. 159 at 3. For example, Lockhart testified that she feared being arrested if she did not cooperate, but she also stated that no officer threatened her with arrest. *See* R. 152 at 175. The Magistrate Judge also found that Lockhart's description of herself as a "terrorized and fragile figure" during the interview was at odds with the "formidable person" he observed during the hearing. R. 159 at 3.

Lockhart challenges the Magistrate Judge's credibility determination on two grounds. First, she argues that all defendants' testimony is self-serving in some sense, so the Magistrate Judge's logic creates a presumption against defendants' credibility. *See* R. 179 at 3–4. But consideration of what a witness has to gain or lose from her testimony is an accepted part of the credibility determination. *See* Sixth Circuit Pattern Jury Instructions 1.07 (directing jurors to consider whether the witness had "anything to gain or lose from the case"). Lockhart knows this, because she goes on to argue that Special Agent Ballman and Detective Adkins had just as much to gain because they had put in "two years of work on the case" and wanted to win. R. 179 at 4. Lockhart's argument is based on a mischaracterization of the record. Detective Adkins had no involvement with the case before Special Agent Bartley asked him to help carry out the search warrant. R. 152 at 105. And there is no evidence that he was involved in the case after the day of the search. The same goes for Special Agent Ballman. *See id.* at 64, 83. The two officers were the equivalent of temps hired by a department store during the holiday rush. Their investment in the outcome of the case was minimal. Furthermore, the officers' testimony included facts that were unhelpful to the government's case. For example, they admitted that Lockhart was upset and crying at times and that their firearms were visible during the interview. *See id.* at 79, 87–88, 96, 108–109, 111–12, 121. Lockhart's theory is that the officers had so much to gain that they conspired to lie on the stand. If that were true, presumably the officers would have done a better job of leaving out unhelpful facts.

Lockhart's second argument is that others testified that she was crying and upset, so she was not exaggerating when she said she was terrified. R. 179 at 6. No one denies that Lockhart cried and was distraught at times during her interview. What the Magistrate Judge

8

did not believe was Lockhart's stated *reason* for her tears—that she feared being arrested if she did not answer questions during her interview. Both Special Agent Ballman and Detective Adkins testified that Lockhart told them that she was upset because the search would damage her family's reputation and financial security. *See* R. 152 at 79, 87–88, 111–12, 121. Lockhart herself said that she was concerned about those impacts on her family during the search and interview. *See id.* at 171. So the Magistrate Judge's conclusion that Lockhart exaggerated her fear of arrest is consistent with his recognition that she was upset during the interview.

Lockhart's Statements During the Interview: Special Agent Ballman documented Lockhart's interview in a memorandum, and Lockhart moved to admit that memorandum during the suppression hearing. *See* R. 152 at 98. The memorandum indicates that Lockhart changed her tune during the interview, first denying guilt then admitting it. *See id.* at 77; R. 159 at 4. The Magistrate Judge concluded that those inconsistencies hurt Lockhart's credibility, especially because the record did not contain inconsistent statements by the government's witnesses. *See* R. 159 at 3–4.

The memorandum was admitted on Lockhart's own motion, but she now argues that the memorandum cannot be used to question her credibility. First, she argues that she never had a chance to challenge the accuracy of the memorandum. *See* R. 179 at 4–5. But the record does not indicate that Lockhart was barred from challenging the account in the memorandum, only that she chose not to. *See* R. 152 at 159 (statement by defense counsel that he did not "expect to ask any questions regarding the substance of the statement that [Lockhart] gave"). Next she argues that using the statements to undermine her credibility is unfair because the very issue in dispute is whether those statements can be used against her at

9

trial. *See* R. 179 at 4. She provides no authority for that argument, even though the Magistrate Judge gave her time to submit supplemental briefing on the issue. *See* R. 159 at 4 n.3. Even assuming she is correct, that would not change the outcome of the credibility determination. The Magistrate Judge clearly stated that his first two reasons "amply support[ed]" the credibility determination and that this third reason was only an "additional[]" basis. *Id.* at 3. But out of an abundance of caution, this Court did not consider those statements when forming its own credibility determination.

The Magistrate Judge's Resolution of Other Factual Disputes: Lockhart then argues that the Magistrate Judge arbitrarily rejected her statement that Special Agent Ballman hurt her during the interview. *See* R. 179 at 5–6. Lockhart testified that Special Agent Ballman took her "by the arm roughly" to see her brother during the interview. *See* R. 152 at 167. She said he took her to see Huffman, pointed at Huffman, asked who he was, and then took her back to the interview when she told him that Huffman was her brother. *See id.* She argues that her statement should not have been rejected because there was no contrary testimony. *See* R. 179 at 5–6. But there was. Detective Adkins testified that Special Agent Ballman learned that Huffman was answering the questions differently than Lockhart and "decided to let her go speak with him, and she walked over and spoke to her brother for a period of time." R. 152 at 113. Special Agent Ballman testified that Lockhart did not believe him when he told her that her brother was confessing, so they "got up, [and] went into that interview room, and . . . had a conversation with her brother." R. 152 at 77. Both Special Agent Ballman and Detective Adkins testified that Lockhart spoke with her brother, but Lockhart testified that Special Agent Ballman merely asked her to identify her brother. Those versions are inconsistent, so the Magistrate Judge had to decide which was more

10

credible. As explained above, he found Detective Adkins and Special Agent Ballman to be more credible than Lockhart. So, he decided to reject Lockhart's testimony about the incident, including her description of how Special Agent Ballman handled her. That decision flowed directly from his credibility determination and was not arbitrary.

Special Agent Ballman's Interview Notes: Lockhart argues that the Magistrate Judge should have discredited Detective Adkins and Special Agent Ballman because the memorandum "contradicts" their testimony. R. 179 at 6. The memorandum stated that "[t]he interview was conducted in a non-custodian setting . . . ." R. 152 at 84. Lockhart asserts that, if Special Agent Ballman had really given her a noncustodial warning, he would have transcribed that warning in his memorandum. *See* R. 179 at 6. Special Agent Ballman explained that he used that language "all the time" to reflect that he conducted a noncustodial interview and gave a noncustodial warning. R. 152 at 100. Lockhart does not point to any evidence that suggests that Special Agent Ballman's normal practice is to transcribe a noncustodial warning word for word in the interview memorandum. So the evidence before the Magistrate Judge supported a conclusion that the memorandum was consistent with Special Agent Ballman's testimony.

Martha Adkins's Testimony: Lockhart's final argument is that the Magistrate Judge should have found Detective Adkins and Special Agent Ballman not credible because Martha Adkins, another pharmacy employee, contradicted their testimony. *See* R. 179 at 6–7.

Martha Adkins was not interviewed by Detective Adkins and Special Agent Ballman; instead, she was interviewed by two other officers. She testified that her interview took place in a sports utility vehicle that was locked some of the time. *See* R. 152 at 134. She said that although no one threatened her with arrest, the officers interviewing her implied that

11

they would take her to the police station for more questioning if she did not cooperate. *See id.* at 139–40. Special Agent Bartley, the lead agent on the case, testified that he told Adkins that if she chose to answer questions, she should do so truthfully. *See id.* at 185.

Lockhart argues that these facts contradict Detective Adkins's and Special Agent Ballman's testimony that the interviews were designed to be low key. *See* R. 179 at 7. They do not. First, it was Special Agent Bartley who testified that he instructed the officers executing the search that the search was "going to be low, low profile." R. 152 at 56. So any contradiction would affect Special Agent Bartley's credibility, not Detective Adkins's or Special Agent Ballman's. Second, there is no contradiction. Special Agent Bartley instructed all the officers to carry out the interviews in a low key manner, but some of them did not. The fact that the two officers who interviewed Adkins might have disobeyed his instructions does not mean Special Agent Bartley did not issue those instructions. Most importantly, it has no bearing on whether Detective Adkins and Special Agent Ballman followed those instructions when interviewing Lockhart. So Adkins's testimony does not cast doubt on the credibility of Special Agent Bartley, Special Agent Ballman, or Detective Adkins.

In sum, this Court agrees with the Magistrate Judge's credibility determination because none of Lockhart's objections persuade this Court that Lockhart is more credible than Detective Adkins and Special Agent Ballman.

## II. The Custody Determination

Lockhart's second objection piggybacks on her first. She claims that the Magistrate Judge's erroneous credibility determination infected his analysis of whether Lockhart was in

custody during the search. *See* R. 179 at 8–9. Lockhart's challenge to the credibility determination failed, so her challenge to the custody determination falls along with it.

A suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before a custodial interrogation. *Miranda v. Arizona*, 384 U.S. at 444. The parties agree that Lockhart was interrogated, so the sole question for the Magistrate Judge was whether Lockhart was in custody for the purposes of *Miranda*. R. 159 at 11.

The test for custody asks whether "there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal quotation omitted). Courts "examine all of the circumstances. . . that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (internal citations and quotation marks omitted). The custody test is an objective inquiry that does not consider the suspect's "actual mindset." *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). The Sixth Circuit has identified four factors for courts to consider: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

The Magistrate Judge applied the *Panak* factors and concluded that Lockhart was not in custody during her interrogation. Two facts supported Lockhart's claim that she was in custody. The interview lasted between two and a half and three hours. See R. 159 at 14. And one of the officers was in uniform. *See id.* The rest of the facts suggest that Lockhart

13

was not in custody. Lockhart was told that she did not have to answer questions and that she was not going to be arrested. *See id.* at 15. She was at her workplace, a familiar environment, and she was not isolated because people walked through the interview room during the interview. *See id.* at 12–13. The questioning officers did not brandish weapons or lock the door of the interview room. *See id.* at 13–14. She was not handcuffed or threatened with physical restraint, and she was not told that she could not use the restroom or make a phone call. *See id.* at 14–15. After the interview was over, Lockhart voluntarily approached one of the interviewing officers and provided him with more information. *See id.* at 15–16. In light of these circumstances the Magistrate Judge found that a reasonable person in Lockhart's position would have felt free to refuse or end the interview, so she was not in custody. *See id.* at 21.

Lockhart's sole objection on the custody issue is dependent on, and thus falls along with, her failed objection on the credibility issue. Lockhart argues that "the analysis changes completely" if the credibility determination comes out her way and she was not given a noncustodial warning. *See* R. 179 at 9. She reduces the Magistrate Judge's analysis to a simple if-then statement: If a noncustodial warning was given, then Lockhart was not in custody. *See id.* at 9. But as the prior paragraph demonstrates, the report and recommendation was more nuanced than that, weighing the noncustodial warning as just one of many factors indicating that the interview was noncustodial. In any case, the Magistrate Judge could consider the noncustodial warning given to Lockhart because his credibility determination was correct. Thus, Lockhart's objection on the custody issue fails.

14

### III. Marrowbone Pharmacy's Motion To Participate and To Suppress

Marrowbone Hometown Pharmacy is one of Lockhart's co-defendants. *See* Criminal No. 7:12-08, R. 82. Marrowbone moved to participate in Lockhart's suppression hearing and to suppress all statements that Lockhart made to law enforcement officers during the search. *See* R. 114. Marrowbone filed that motion the day before the suppression hearing, so the United States did not have time to respond to the motion before the hearing started. *See* Criminal No. 7:12-08, R. 136 at 21. The Magistrate Judge allowed Marrowbone to participate in the hearing and question witnesses. *See id.* That means that Marrowbone's request to participate in the suppression hearing is now moot.

The Magistrate Judge recommended that this Court deny Marrowbone's motion to suppress for two reasons. First, clear Supreme Court precedent states that corporations do not have a Fifth Amendment right against self-incrimination. *See id.* at 22 (citing *United States v. White*, 322 U.S. 694, 699 (1944)); *see also George Campbell Painting Corp. v. Reid*, 392 U.S. 286, 288–89 (1968) ("It has long been settled . . . that the constitutional privilege against self-incrimination . . . cannot be utilized by or on behalf of any organization, such as a corporation." (internal quotation marks omitted)). Marrowbone cannot move to suppress based on a violation of its right against self-incrimination because it does not have that right. Second, the Magistrate Judge pointed out that Marrowbone did not make any unique arguments, instead Marrowbone simply "adopt[ed] and incorporat[ed]" Lockhart's arguments. *See* Criminal No. 7:12-08, R. 114-1 at 4 n.3. Because Lockhart's motion lacked merit, the Magistrate Judge concluded that Marrowbone's motion did too. *See* Criminal No. 7:12-08, R. 136 at 22–23.

Marrowbone argues that its claim was based on the right to a fair trial under the Due Process Clause, not the Self-Incrimination Clause.  *See* Criminal No. 7:12-08, R. 141 at 10–12.  There are two problems with Marrowbone's argument.  First, Marrowbone does not cite any cases in support of its claim that the introduction of Lockhart's statements against it at trial would be a due process violation.  Second, it does not even explain why, logically, that would be the case.  At best, Marrowbone's argument is that it would be unfair to use statements that were obtained in violation of Lockhart's right against self-incrimination to convict Marrowbone.  *See id.* at 11 (referring to the "galling nature in which [Lockhart's] statements were obtained" and decrying the unfairness of convicting Marrowbone on the basis of "evidence obtained in violation of rights protected elsewhere in the Constitution").  That looks a lot like a self-incrimination argument cloaked in the garb of due process.  Leaving the label of the argument aside, admitting the statements is not unfair because, as explained above, Lockhart's statements were not taken in violation of *Miranda*. So Marrowbone's objection fails because it depends on Lockhart's failed *Miranda* claim.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1) The Court **OVERRULES** defendant Beverly Lockhart's objections, Criminal No. 7:12-09, R. 179, and **ADOPTS** and **ACCEPTS** Magistrate Judge Hanly Ingram's Report and Recommendation, Criminal No. 7:12-09, R. 159, denying the motion to suppress, Criminal No. 7:12-09, R. 108.

(2) The Court **OVERRULES** defendant Beverly Lockhart's objections, Criminal No. 7:12-08, R. 141, and **ADOPTS** and **ACCEPTS** Magistrate Judge Hanly

Ingram's Report and Recommendation, Criminal No. 7:12-08, R. 136, denying the motion to suppress, R. 90.

(3) The Court **OVERRULES** defendant Marrowbone Hometown Pharmacy's objections, Criminal No. 7:12-08, R. 141, and **ADOPTS** and **ACCEPTS** Magistrate Judge Hanly Ingram's Report and Recommendation, Criminal No. 7:12-08, R. 136, denying the motion to participate in the suppression hearing and to suppress, Criminal No. 7:12-08, R 114.

This the 4th day of April, 2013

Signed By:
*Amul R. Thapar* AT
United States District Judge