UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 12-9-ART-(4) |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BEVERLY LOCKHART, | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Our system casts the jury, not the Court, as the star of the criminal trial. The jury, not the Court, is charged with weighing the evidence, evaluating the testimony, and sorting the innocent from the guilty. Nor is the Court a more experienced understudy, waiting in the wings to usurp the spotlight in hard cases, or close cases, or even in cases where the Court thinks the jury got it wrong. Only in cases where there was a complete failure of proof may the Court replace the jury's verdict with its own judgment. There was no such failure here, so the jury's verdict must stand.

## BACKGROUND

If all the world's a stage,[1] then Eastern Kentucky has the rotten luck of repeatedly hosting plays about oxycodone conspiracies. The first act of this familiar tale's latest iteration began when Dennis Varney, a drug dealer, learned about Dr. Linda Roos. Roos practiced medicine in Houston, Texas, and she was willing to write prescriptions for extraordinary amounts of oxycodone—despite that drug's standing as a highly addictive

---

[1] William Shakespeare, As You Like It, act 2 sc. 7.

Schedule II controlled substance. At first, Varney and his associates would travel to see Roos every month. As their relationship became more familiar, Roos required that Varney and the others visit only every other month. Whether they visited or not, Roos would write them prescriptions for alarming numbers of pills each month. At the height of the conspiracy, Roos was prescribing more than 1,200 oxycodone pills per month to a single patient. Varney and company would fill the prescriptions at the Marrowbone Clinic Pharmacy (the "Pharmacy"), in Pikeville, Kentucky, and then sell the pills on the street.

The curtain began to close on the Varney-Roos conspiracy when the FBI (in an unrelated case) obtained a search warrant for Varney's home. During the search, the FBI found some of the prescriptions that Roos had written for Varney. The quantity of pills she had prescribed raised a red flag for the FBI and sparked an investigation that brought down the entire enterprise. Agents cracked the Varney drug ring in 2011, and one of Varney's associates, Eddie West, agreed to wear a wire into Roos's office. Shortly thereafter, federal officers swept the players off the stage and into federal court. Roos, Varney, and Varney's partners all pled guilty to conspiring to distribute oxycodone.

This case concerns a member of the conspiracy's supporting cast: the Pharmacy's office manager, Beverly Lockhart. Lockhart frequently waited on Varney and his associates. Multiple witnesses testified that Lockhart was especially solicitous of the conspirators' needs: she opened the Pharmacy outside of regular business hours for them; she dispensed pills to them when no pharmacist was present; she allowed them to "borrow" pills against future prescriptions; she would drop whatever she was doing to assist them; and she allowed them to skip the line.

A grand jury charged Lockhart with conspiring to distribute oxycodone as part of

the Roos-Varney conspiracy. R. 336. Lockhart denied the charge, and her case proceeded to trial. The jury found her guilty. R. 395. Lockhart now challenges her conviction, arguing that there was insufficient evidence to support the jury's verdict. *See* R. 393-1.

## DISCUSSION

The jury convicted Lockhart of conspiring to distribute oxycodone, in violation of the Controlled Substances Act (the "CSA"). *See* 21 U.S.C. §§ 801 *et seq.* The conspiracy charge required the government to prove that Lockhart knowingly joined a conspiracy, the object of which was to violate the CSA. *See id.* § 846. Proving that medical personnel intended to violate the CSA can be a tricky business. Although the CSA generally prohibits the distribution of controlled substances, *see id.* § 841(a), it contains an important exception for doctors. *See id.* § 829. A properly registered doctor may prescribe controlled substances "for a legitimate medical purpose" if he acts "in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). And a pharmacist may fill a doctor's prescription. *See id.*; 21 U.S.C. § 829.

But a pharmacist is not automatically immune when she fills a prescription written by a doctor. "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a). So, if a pharmacist fills a prescription knowing that it was not issued for a legitimate medical purpose and in the usual course of professional treatment, she violates § 841(a). *Id.* Lockhart was not a pharmacist, but the government pursued a theory of liability that required it to prove (1) that Roos issued the prescriptions illegally, and (2) that Lockhart knew the prescriptions were illegitimate when she distributed the pills to the conspirators.

3

*See* R. 392 at 4.

Lockhart moved for a judgment of acquittal. R. 393. Her argument is simple: she urges that all the evidence tended to show only that she operated the pharmacy sloppily or in violation of laws other than the CSA. *See generally* R. 393-1. She insists that the government failed to prove either that Roos issued the prescriptions illegally or—even if she did—that Lockhart knew about it. *See id.*

Federal Rule of Criminal Procedure 29 requires the Court to enter a judgment of acquittal if the evidence was insufficient to prove the offense charged. A defendant challenging the sufficiency of the evidence "bears a very heavy burden." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (internal quotation marks omitted). The jury's verdict must stand if, viewing the evidence in the light most favorable to the United States, "any rational trier of fact" could have convicted the defendant. *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013).

## I. There Was Sufficient Evidence That Roos Issued the Prescriptions Illegally

Lockhart suggests that either expert testimony or direct evidence was required to prove that Roos issued the prescriptions without a legitimate medical purpose and outside the course of her professional practice. R. 393 at 1, 10; R. 431 at 6 ("This Circuit's cases . . . have required either expert testimony or direct evidence . . . ."). She says that the government presented neither and that any circumstantial evidence was insufficient to sustain her conviction. *See* R. 431 at 4–8.

Insofar as Lockhart insists that expert testimony is required, she is wrong: no rule requires the government to introduce expert testimony to prove that a doctor issued prescriptions illegally. *See United States v. Word*, 806 F.2d 658, 662–63 (6th Cir. 1986)

4

(collecting cases); *see also United States v. Pellman*, 668 F.3d 918, 924 (7th Cir. 2012) (explaining that courts have "uniformly held that [expert] testimony is not required"). Although expert testimony "may be helpful to a jury, there are cases in which the lay testimony is so clear that no expert testimony is required to determine that the defendant's actions were not for a legitimate medical purpose nor in the usual course of professional practice." *Word*, 806 F.2d at 663. Nor does Lockhart provide any citation (or explanation) for her suggestion that only direct evidence can prove that a doctor issued prescriptions illegally. *See* R. 431 at 6. So, when considering the sufficiency of the evidence, the Court must review the entire record—lay testimony and circumstantial evidence included—while drawing all reasonable inferences in favor of the government. *See United States v. Campbell*, 549 F.3d 364, 374 (6th Cir 2008).

The jury reasonably could have concluded that Roos issued the prescriptions illegally for two independent reasons: because Roos pled guilty in this case and the jury knew about her plea, and because she prescribed incredible amounts of powerful drugs despite only occasionally examining her patients.

### A. Roos's Guilty Plea

The jury learned that Roos pled guilty in this case and that she was a member of the conspiracy. FBI investigator Randy Hunter explained how the FBI's investigation of Varney expanded to include Roos after they discovered the prescriptions she wrote for him. In fact, given the size of the prescriptions she was writing, Roos replaced Varney as the investigation's main target. The jury also heard how that investigation ended: with Eddie West (one of the conspirators for whom Roos wrote the largest prescriptions) wearing a wire into her office and with Roos pleading guilty and surrendering her medical

5

license.

Roos's conviction in this case is conclusive evidence that she issued the prescriptions to the conspirators illegally. Short of an in-court admission by Roos (which, in any event, would very much resemble a guilty plea), it is hard to imagine more persuasive evidence that the prescriptions violated the CSA. Lockhart's brief makes no mention of the evidence relating to Roos's conviction. *See* R. 393. Thus, Lockhart has completely failed to explain why the jury could not consider the most powerful evidence that the prescriptions were illegal: the fact of Roos's guilty plea.

**B.    Roos Prescribed Enormous Numbers of Powerful Pills Despite Conducting Only Occasional Examinations**

Even if the government had not proved Roos's guilt, there would still have been sufficient evidence that the prescriptions were illegal. Roos prescribed the conspirators a jaw-dropping number of pills. At the height of the conspiracy, Roos prescribed 1,230 pills for West and 680 pills for Varney each month. To consume 1,230 pills in a single month, one would need to take nearly two pills an hour, every hour (without sleeping), every day. And oxycodone is not some run-of-the-mill pain pill. Paula York, a registered pharmacist, testified that oxycodone is a Schedule II controlled substance, meaning that it is among the strongest painkillers on the market and that it has the highest potential for abuse and addiction.

Lockhart says that the raw number of pills is irrelevant without medical context. R. 431 at 4. But courts have affirmed convictions in similar cases based, in part, on a doctor's prescription of an absurd number of pills. *See Word*, 806 F.2d at 663; *United States v. Joseph*, 709 F.3d 1082, 1104 (11th Cir. 2013) (noting whether a physician

prescribed "an inordinately large quantity of controlled substances" as one factor suggesting a prescription was illegal) (internal quotation marks omitted). And this Circuit recently explained that a prescription for 660 pills (only a portion of which were powerful painkillers) supported an inference of improper prescription practices, partly because of "the sheer drug quantity." *See United States v. Volkman*, No. 12-3212, 2013 WL 6211796, at \*14 (6th Cir. Nov. 21, 2013) (also noting that the patient had a history of drug addiction and dealing).

Nor was the unusual character of Roos's prescriptions left for the jury to intuit: Hunter described Roos' prescriptions for West and Varney as "extraordinary." A relief pharmacist at the Pharmacy said she remembered the conspirators because of the "unreal" amounts of oxycodone they received. Common sense, the number of pills, and the testimony of the witnesses all suggested that a doctor cannot properly prescribe 1,200 powerful pain pills—which just-so-happen to lead the league in potential for addiction and abuse—for one person for a single month.

To make matters worse, Roos prescribed that alarming quantity of pills despite conducting only occasional examinations. West and Varney both testified that they visited Roos only every other month, but she nevertheless wrote them prescriptions for each intervening month as well. When West did make the trip to Texas, he said Roos would "sometimes" conduct a physical exam. She neither conducted any tests nor referred West or Varney to physical therapy or alternative treatment. That Roos only occasionally examined West despite prescribing him such a remarkable amount of drugs further supports the jury's conclusion that Roos distributed the prescriptions illegally. *See United States v. Hung Thien Ly*, No. 12-16580, 2013 WL 5878451 (11th Cir. Nov. 4,
7

2013) ("Some factors that we have recognized as indicative of a doctor's illegitimate dispensation of drugs [are whether] (1) inordinately large quantities of controlled substances are prescribed; . . . and (3) only cursory or no physical examinations are given."); *United States v. Phung*, 384 F. App'x 787, 789–90 (10th Cir. 2010) (affirming the conviction of a doctor in part because he "prescribed high doses and large quantities of narcotic painkillers . . . following little or no examination").

To sum up: the jury learned that Roos pled guilty in this case, that she prescribed alarming amounts of the most powerful pills, and that she did so despite only occasionally examining her patients. Viewing that evidence most favorably to the verdict, the jury reasonably could have concluded that Roos issued the prescriptions illegally.

## II. There Was Sufficient Proof That Lockhart Knew Roos Was Prescribing the Drugs Illegally

Lockhart next argues that she was unaware that Roos issued the prescriptions illegally. R. 393-1 at 8–9. Lockhart suggests that the government's failure to adduce any direct evidence of her knowledge requires acquittal. *Id.* at 8. But the only case she cites for that proposition expressly approved the use of circumstantial evidence to show knowledge of illegal prescription practices. *United States v. Lovern*, 590 F.3d 1095, 1105 (10th Cir. 2009) (explaining that it was "entirely appropriate" for the government to use circumstantial evidence, because "proof of *mens rea*, of what lies inside the recesses of the defendant's mind, very often must depend on circumstantial, rather than direct, evidence"). Again, the question is not whether the government introduced a particular kind of evidence, but whether the evidence it introduced was sufficient to support the verdict.

8

Lockhart's main argument on this front, however, is that the evidence tended to show only that the pharmacy was run poorly or in violation of laws other than the CSA, not that she knew the prescriptions were dispensed illegally. R. 431 at 10. The premise of Lockhart's argument is valid: the government was required to prove that Lockhart knew the prescriptions were illegal, not merely that she broke the law in the course of running the pharmacy. R. 392 at 4. Courts must carefully parse evidence of knowledge regarding the illegality of prescriptions from general evidence of a pharmacy's illegal practices. Where the government proves only the latter, it often fails to prove a violation of the CSA. *See Lovern*, 590 F.3d at 1104. In *Lovern*, the government proved conclusively that a computer technician was aware of irregularities at the pharmacy, but it adduced no evidence that the defendant knew that the prescriptions were issued illegally. *See id.* The government pursued a similar theory of liability here, so Lockhart urges that this case is no different.

Most of the evidence in this case did not bear on Lockhart's knowledge regarding the prescriptions. Her practices of loaning pills to the conspirators and distributing their prescriptions without a pharmacist present, for example, were both illegal, but have nothing to do with the illegality of the prescriptions themselves. Nevertheless, two portions of the testimony distinguish Lockhart from the computer technician in *Lovern* and provide powerful circumstantial evidence that Lockhart knew the prescriptions were illegal. First, the government adduced evidence that Lockhart ordered a cover-up. And second, Lockhart responded to concerns about the size of Roos's prescriptions with an incriminating statement, confirming that she wanted to keep the details of the prescriptions from public view.

### A. The Cover-Up

The most damaging evidence in this case was proof that Lockhart ordered a cover-up to disguise the Pharmacy's sales of Schedule II substances. A government agent audited the Pharmacy's records as part of the United States' investigation. She found that the Pharmacy dramatically under-reported the amount of Schedule II substances it distributed during the conspiracy. The pharmacy's records failed to account for slightly over 261,000 Schedule II pills. Danette Damron, a relief pharmacist at the Pharmacy, explained how the shortage came about. While trying to check the price of a previous sale for a customer, she discovered that many records of Schedule II sales had been deleted from the Pharmacy's computer system.

Standing on its own, the systematic deletion of certain entries indicates only that someone (not necessarily Lockhart) sought to disguise the real number of Schedule II pills that the Pharmacy distributed. But the audit did not stand alone. The United States offered persuasive evidence that Lockhart ordered an employee to delete the files. Sheena Mullins, a pharmacy technician who pled guilty to healthcare fraud, testified that Lockhart repeatedly ordered her to edit or delete the records of sales made to members of the conspiracy.

The defense offered no plausible explanation of Lockhart's actions. Instead, the defense sought to impeach Mullins by referring to her guilty plea and plea agreement. The jury, of course, was not required to conclude that the defense succeeded. And on a Rule 29 motion, the Court is "bound to make all reasonable inferences *and credibility choices* in support of the verdict." *Campbell*, 549 F.3d at 374 (emphasis added). If the jury believed Mullins—as they reasonably could have—then they could have inferred that

Lockhart had a reason to cover up the sales to the conspirators: because she knew Roos's prescriptions were illegal.

Indeed, in the absence of any exculpatory theory to account for Lockhart's conduct, this was the most natural inference that the jury could have drawn. Courts routinely admit evidence of cover-ups for precisely this reason: because a cover-up "can be probative of elements of the underlying crime *such as knowledge*." *United States v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013) (emphasis added); *United States v. Collins*, 90 F.3d 1420, 1428 (9th Cir. 1996) (evidence of a cover-up is "indicative of consciousness of guilt"). If Lockhart did not know the prescriptions were illegal, then why order Mullins to delete the records of the sales? The defense offered no plausible answer to that question. The evidence of the cover-up alone was thus sufficient to support the jury's determination that Lockhart knew the prescriptions were illegal. *See Mehanna*, 735 F.3d at 42; *Collins*, 90 F.3d at 1428.

Although the cover-up is sufficient to sustain Lockhart's guilt by itself, it is even more damaging when viewed in the full context of the trial. In isolation, Lockhart's special treatment of the conspirators has naught to do with the CSA or the government's theory of liability: it is obviously legal to open a pharmacy at irregular hours and to treat some customers better than others. And although it was illegal to distribute prescriptions without a pharmacist present and to loan pills to the conspirators, those violations do not tend to show that Lockhart knew the prescriptions were illegitimate. Viewed through the lens of the cover-up, however, those actions come into focus as individual parts of a decidedly criminal whole. Lockhart put the needs of the conspirators first because she was engaged with them in an illicit enterprise: to fill quickly prescriptions for incredible

11

amounts of oxycodone before promptly covering up the sales so that the crime would go undetected. Or at least a reasonable juror could have concluded as much.

B. **Lockhart's Response to an Employee's Question**

Lockhart's response to the concerns another employee raised regarding Roos's prescriptions similarly suggests her guilt. Vickie Coleman, a pharmacy technician, asked Lockhart about the high number of pills the Pharmacy was distributing to a member of the conspiracy. Lockhart responded: "what happens in the pharmacy stays in the pharmacy."

Again, the defense offered no plausible explanation for Lockhart's conduct. Instead, the cross-examination focused on impeaching Coleman for bias: Coleman and Lockhart had fallen out, and Coleman told the authorities that she hated Lockhart. Still, viewing the testimony most favorably to the government, a reasonable juror could have believed Coleman. *See Campbell*, 549 F.3d at 374. And if the jurors credited Coleman's testimony, then they would have wondered why Lockhart responded to Coleman's concerns with what sounds like a veiled threat rather than a legitimate answer. In combination with the cover-up, Lockhart's comment suggests that she was determined to keep the true number of Schedule II pills the Pharmacy was issuing squarely within the walls of the Pharmacy. In light of the testimony and the parties' competing theories of the case, the only plausible explanation was that Lockhart sought to cover the Pharmacy's tracks because she knew that Roos's prescriptions were illegal.

III. **Lockhart Is Not Eligible for Release on Bond**

In addition to moving for a judgment of acquittal, Lockhart moved to be released on bond. R. 394. Lockhart is eligible for release on bond only if (1) there is a substantial likelihood that her motion for acquittal will be granted, or (2) the United States has

recommended that no sentence of imprisonment be imposed. 18 U.S.C. § 3143(a)(2)(A)(i)–(ii). Because the Court has denied her motion for a judgment of acquittal, there is no "substantial likelihood" that it will succeed. 18 U.S.C. § 3143(a)(2)(A)(i). And because the United States is seeking a sentence of imprisonment, § 3143's other exception does not apply either. *See id.* § 3143(a)(2)(A)(ii). Therefore, Lockhart must be detained pending sentencing. *See id.* § 3143(a) (requiring detention pending sentencing unless an exception applies).

## CONCLUSION

The jury weighed the evidence and found Lockhart guilty. Under Rule 29, the Court has no license to revisit that judgment absent a total failure of proof, such that no reasonable trier of fact could have convicted the defendant. Viewed most favorably to the United States, the considerable evidence discussed above comfortably suffices to support the jury's verdict.

Accordingly, it is **ORDERED** that:

(1)  Lockhart's motion for acquittal, R. 393, is **DENIED**.

(2)  Lockhart's motion for release on bond, R. 394, is **DENIED**.

(3)  The government's motion for leave to file a document under seal, R. 407, is **GRANTED**.

This the 18th day of December, 2013.



Signed By:
*Amul R. Thapar* AT
**United States District Judge**